475 So.2d 666 (1985)
Megan MOORE, et al., Petitioners,
v.
Chester MORRIS, et al., Respondents.
No. 63805.
Supreme Court of Florida.
June 27, 1985.
Rehearing Denied October 7, 1985.
*667 Sams, Gerstein, Ward, Newman and Beckham, and Mark Hicks of Daniels and Hicks, Miami, for petitioners.
Joe N. Unger of the Law Offices of Joe N. Unger, Miami, for Chester Morris, M.D., William J. Brewster, M.D. and North Shore Hosp.
Wicker, Smith, Blomqvist, Tutan, O'Hara, McCoy, Graham and Lane and Richard A. Sherman of the Law Offices of Richard A. Sherman, Fort Lauderdale, for Arthur Schatz, M.D.
ADKINS, Justice.
We have before us a petition to review a decision of the Third District Court of Appeal reported as Moore v. Morris, 429 So.2d 1209 (Fla. 3d DCA 1983). Conflict is alleged with decisions of this Court and other district courts of appeal. We have jurisdiction. Art. V, § 3(b)(3), Fla. Const.
This is an appeal from the granting of a final summary judgment for the defendants in a medical malpractice action. We hold that summary judgment was inappropriate under the facts of this case and we quash the holding of the Third District Court of Appeal.
Megan Moore was born July 9, 1973. The instant action, seeking damages for injuries allegedly sustained at her birth, was filed by her parents Henry and Susan Moore in behalf of their daughter on April 25, 1978. The trial court granted summary judgment for the defendants, holding that the action was barred by the applicable statute of limitations. The Third District Court of Appeal affirmed. The court of appeal determined that the applicable statute of limitations is section 95.11(6), Florida Statutes (1973), and the applicable time to commence the action was within two years of the infant's birth. 429 So.2d at 1209 n. 1 (citations omitted).
This Court has held that the statute of limitations in a medical malpractice case does not begin to run until either "the plaintiff has notice of the negligent act giving rise to the cause of action or when the plaintiff has notice of the physical injury which is the consequence of the negligent act." Nardone v. Reynolds, 333 So.2d 25 (Fla. 1976). Therefore, the issue to be determined by this case is when the Moores had notice or should have had notice of either the negligent act or of injury to Megan. However, our role as a reviewing Court is narrow. This case comes to us following the granting of a final summary judgment by the trial court and its affirmance by the district court of appeal. Our duty is to determine only whether the granting of the summary judgment was proper.
*668 Summary judgments should be cautiously granted in negligence and malpractice suits. Giallanza v. Sands, 316 So.2d 77 (Fla. 4th DCA 1975). The law is well settled in Florida that a party moving for summary judgment must show conclusively the absence of any genuine issue of material fact and the court must draw every possible inference in favor of the party against whom a summary judgment is sought. Wills v. Sears, Roebuck & Co., 351 So.2d 29 (Fla. 1977); Holl v. Talcott, 191 So.2d 40 (Fla. 1966), cert. denied, 232 So.2d 181 (Fla. 1969). A summary judgment should not be granted unless the facts are so crystallized that nothing remains but questions of law. Shaffran v. Holness, 93 So.2d 94 (Fla. 1957).
If the evidence raises any issue of material fact, if it is conflicting, if it will permit different reasonable inferences, or if it tends to prove the issues, it should be submitted to the jury as a question of fact to be determined by it. Williams v. Lake City, 62 So.2d 732 (Fla. 1953); Crovella v. Cochrane, 102 So.2d 307 (Fla. 1st DCA 1958).
The decision of the district court of appeal in the instant case conflicts with all of the above decisions.
All agree that prior to the time for Megan's delivery, Susan Moore experienced a normal pregnancy with no complications. The events leading up to and since Megan's birth are very much in dispute by the parties, however. The district court found the facts as follows:
Prior to the mother being taken to the hospital for delivery it was a normal pregnancy. After she commenced labor the husband was advised there was an emergency and the baby would be taken by Cesarean Section. After the baby was born the father was on notice that for a period in excess of thirty minutes, while the infant was "blue," the doctors had attempted to administer oxygen; that they were unsuccessful in their treatment, and received permission to transfer the infant to the emergency facility at Jackson Hospital, that one of the doctors did not expect the baby to live, another doctor told the father that he did the best he could and (apparently the baby would not live) and he, the father would have to do what he had to do.
While the child was being transported to Jackson in an emergency vehicle her chest was cut open and a tube inserted to assist her in breathing. The parents knew that it was an emergency situation, that there was a problem with the delivery, that the child had swallowed something which restricted breathing, and that the child was starved for oxygen.
429 So.2d at 1209-10.
Based upon these facts, the court concluded that "as a matter of law they (the parents) were on notice from the time of the birth of the alleged negligence or of injury to the infant and therefore, the trial judge was correct in granting a summary judgment based on the statute of limitations." Id. at 1210 (citations omitted).
In its opinion, the Third District appears to have placed great significance upon the existence of an emergency situation, the performance of a Cesarean section, and that the father was advised that the baby might not live due to oxygen deprivation caused by swallowing something while in the womb. There is nothing about these facts which leads conclusively and inescapably to only one conclusion  that there was negligence or injury caused by negligence. To the contrary, these facts are totally consistent with a serious or life threatening situation which arose through natural causes during an operation. Serious medical circumstances arise daily in the practice of medicine and because they are so common in human experience, they cannot, without more, be deemed to impute notice of negligence or injury caused by negligence.
Cesarean sections are not the natural way to give birth. However, the performance of "C" sections as a result of difficulties with delivery are so common in our society that they are accepted as normal *669 and they are not associated with negligence or injury.
The blue complexion of the baby which the Moores believed resulted from a natural biological cause (swallowing something in the womb) and the fact that it was life threatening also does not lead conclusively to the conclusion reached by the Third District. This is particularly true where, as here, the baby physically appeared to have made a speedy and complete recovery. The parents were also repeatedly told by the physicians, including Dr. Brown who examined Megan neurologically until she was three years old, that Megan was fine. In addition, Dr. Brown could not and did not scientifically diagnose any brain damage until the child was three years old.
The third district also found something conclusive about Dr. Morris' statement to Henry that he did the best he could and that Henry would have to do what he had to do. This statement was made at a traumatic time when Henry was worried about his child's welfare. Viewing the statement in retrospect knowing what we now know about the brain damage, its meaning is at best confusing and unclear. However, the statement is totally inconclusive when put into the perspective of the physicians telling the Moores that the baby was fine. In any event, Henry testified that he did not know what Dr. Morris meant by the statement and he had no feelings about whether or not any physician had done anything improper. In fact, Dr. Morris has never testified that he made the statement or what was meant by the statement.
Thus, under this record, Henry's interpretation of the statement is uncontroverted. Clearly, Henry's testimony coupled with the statement by Dr. Morris, which to this day is unclear as to its exact meaning, supports the Moores' position that they did not know or suspect injury or negligence.
Also, there is other evidence in the record that would tend to prove that the Moores were not on notice of either the negligent act or of the injury at the time of the infant's birth. Susan Moore's testimony was that after she woke up in the recovery room she was told that the baby had suffered fetal distress, and because of it, a Cesarean section had to be performed and the baby was transferred to another hospital, but that "she was alive and well at Jackson and doing very well." When Megan was discharged from Jackson it was Susan's understanding that Megan was fine  she was not aware of any damage to Megan when she was discharged.
The uncontroverted testimony of Henry Moore also shows that he did not have any feelings at the time of Megan's birth about whether or not any physician had done anything improper and he thought that Megan was fine when she was discharged from Jackson.
The testimony of the other physicians who cared for Megan during her birth shows that none of them discussed with the parents the cause of Megan's "fetal distress" nor that she might suffer neurological problems later on in life. With all this evidence in the record, genuine issues of material fact remain and summary judgment should not have been granted.
Other cases from the courts of this state support this conclusion. For example, in Almengor v. Dade County, 359 So.2d 892 (Fla. 3d DCA 1978), the plaintiffs filed a medical malpractice action against the defendant hospital on the grounds that their baby daughter was negligently delivered at birth, thereafter negligently cared for and that, as a result, the baby suffered severe brain damage. The plaintiffs did not file suit until four years after the baby's birth. The trial court entered summary judgment in favor of the defendant on the ground that the action was barred by the then applicable four-year statute of limitations, section 95.11(4), Florida Statutes (1969).
Judge Hubbart, writing for a unanimous court, reversed the summary judgment, concluding that genuine issues of material fact existed as to whether the plaintiffs were on notice of an invasion of their legal rights more than four years prior to the filing of the medical malpractice action. In reaching its decision, the Court stated as follows:

*670 There is some evidence in the record that during this time the plaintiff was aware or should have been aware that the baby was born mentally retarded and thereafter showed signs of mental retardation and abnormal development. We do not believe, however, that this evidence put the plaintiff on notice as a matter of law that the baby was injured during birth because such evidence just as reasonably could have meant that the baby had been born with a congenital defect without any birth trauma.
359 So.2d at 894.
Unlike the parents in Almengor, who knew that mental retardation existed at birth, here the lack of oxygen to Megan appeared to result from something she swallowed while in her mother's womb, her distress was temporary and she was thought to have fully recovered. See also Salvaggio v. Austin, 336 So.2d 1282 (Fla. 2d DCA 1976).
For these reasons, the decision of the Third District Court of Appeal affirming the granting of a final summary judgment in this case should be quashed and the cause is hereby remanded to the district with instructions to remand same to the trial court for further proceedings.
It is so ordered.
BOYD, C.J., and OVERTON, McDONALD, EHRLICH and SHAW, JJ., concur.
ALDERMAN, J., dissents.